Take your time in getting settled. Mr. Reid, if you will, please proceed. Thank you. Good morning. May it please the Court, there are three issues that I hope to address today. First is a finding that Claim 1, the exemplary claim in this case, is patent eligible would be irreconcilable with this Court's decisions in AMP 1 and AMP 2, which found that the Claim 20 of the Myriad patent in that case was patent eligible because it was premised on the use of a man-made material. It would also create an exception, I believe. AMP is Myriad? It's the Association for Molecular Pathology line of cases, and there is a first case, AMP 1, and then a second case, AMP 2, that ultimately went up as Myriad, yes. It's also going to create an exception to the Supreme Court's guidance in Chakrabarty and in the Myriad decision, which both cases held that man-made compositions are patent eligible. And in this case, Claim 1 is premised on the use of a chemically altered amplified non-coding DNA. Second, when the Court treats all of the allegations of GTG's amended complaints in this case as true, as it must under Rule 12b-6, there's only one logical conclusion that it can come to, and that is that GTG has plausibly demonstrated that Claim 1 claims an eligible subject matter. And then thirdly, even if the Court goes ahead and applies the Mayo-Alice test fully to Claim 1 at this stage, it passes that test. The claim is not directed to a patent. How do you distinguish Ariosa? I thought you might ask me that. There's a couple of things that readily distinguish this claim from Ariosa. Firstly, this patent was filed eight years earlier. So whatever the science was that was involved in the Ariosa case... What difference does that make? Well, because we're measuring whether the use of the techniques in Claim 1 were routine and conventional at the time the patent was filed. So in the Ariosa case... So you're challenging the second step of Mayo and saying they weren't routine and conventional when the patent was filed? Well, the Ariosa claim, Claims 1, I believe, 125 and 26, those exemplary claims essentially said we found a new place where you can find cell-free fetal DNA. Just go get it. Claim 1 in this case, the discovery is that there's linkage disequilibrium that can exist between a non-coding region and a coding region allele. And this inventor, Dr. Simons, realized that there is something I can do with this information. I can actually... I don't understand what the timing has to do with this. With respect to the amplification step, there was an amplification step in Ariosa. The issue in the Ariosa claim would have been whether it was routine and conventional to Claim 1, that application was filed in 1989. So are you saying that amplifying was well known and not inventive in Ariosa, but was inventive at the time of your... That's exactly what I'm saying, Your Honor. But your spec says. Everybody knows how to do amplification. What the specification says is that amplification generically is a known technique, but we're applying this in a new way. Right. I mean, I guess it seems to me that your... The argument that struck me as at the core of your point has nothing to do with timing. It is rather that Sequinam said, we now know something exists, use conventional techniques, find it. Yeah. Yours doesn't say that. Yours says, we want to find, A, the exons, the actual genes. And our clever idea is we're going to look for B. That's not, at least according to anything I see in the spec, or the complaint, or the district court opinion, proven for motion to dismiss purposes to be utterly conventional. If you want to find B, the allele, that's the last words of the claim are, in order to find the allele, look for something not the allele. Why is that not an inventive concept, which has nothing to do with timing? It is an inventive concept, and there's a couple of different ways to look at the inventive concept. But the timing issues, we're measuring when something is routine and conventional at the time that the patent is filed. So what might have become routine and conventional by the time that the Ariesa claim was filed is completely different than... Let me jump in. I mean, are you arguing that it's step two of Mayo that amplification wasn't routine and conventional when this patent was filed? It was not, Your Honor. And let me go back to what was happening at that point in time. So the two... One of the patents that's cited in the 179 patent application and in the patent is the Kerry Mullis patent on PCR amplification. Those patents... There was two, actually, and one of them cited in the 179 patent. Those patents didn't even issue until 1987, and they weren't licensed until 1989 for the first time. And that's the same year that the parent application for the 179 patent was filed. Were the techniques being practiced during all of the time that the application was pending before it was issued and licensed? The abstract technique of DNA amplification was being practiced at the time, and the patent recognizes that and says, we are using this technique in a new way. Those of skill in the art would know how to implement this this way, but it's a new way to do it that nobody's ever thought of. And that was an implementation that was... But see, the problem is, I'm not sure, at least with me, you're going to make any progress on saying that amplification as described here as prior art and background is something new. But if the question is, is there a difference of legal significance between sequenom and this? The only thing that I can see as even a possibility is that the sequenom claim says, now that we know something exists, use the technique everybody would use to find it. This doesn't say that. This says, now that we know there's a link between A and B, we don't care about A for its own sake. We care about B. Find A in order to find B. That was Dr. Simon's observation as to how he could use his discovery that there was something existing, there was a link between A and B, to use your nomenclature. There is an inventive concept on top of what you're talking about. Which is what? It is, no one had ever before amplified one region of DNA, created an amplified material. This is now a man-made material that is chemically different. Analyze that material in order to find a different location of DNA, regardless of whether those two locations of DNA is non-coding and coding. Just the technique of looking one place in DNA and amplifying it. I looked in the spec and the complaint, and at least my eyes were not picking up anything to the contrary of what you just said. And this is why I'm fastening onto what I guess are the last words of the claim, in order to find the allele, look for something else. I can't find the basis for saying, oh, everybody knows that once you know there's a linkage between A and B in this area, you can and indeed should look for A in order to find B. Regardless of what A and B are, as I think you just said. Correct, and that observation that one could look in one location to find another location was Dr. Simon's observation that was enabled by his discovery that these things did exist together. Nobody knew that. Yeah, but that's step one. Well, it is the discovery, and you're talking about the directed to, and so the question is, is the claim directed to the discovery? Our position is that it's not. It doesn't recite the discovery. It doesn't claim it. And then the other issue, though, as some of this panel recognized in the BRCA1 case, is this directed to an abstract idea of using one thing to find another, where you know the two things are linked together. And our response to that is, there's an inventive concept on top of that, and that is that no one had ever amplified one region of DNA before and examined that amplified material to detect a different location of DNA. That by itself is an inventive concept. That is enough to pass through that coarse 101 filter to be subject to a 102 and a 103 analysis. But I want to go back to Claim 20 of the Myriad Patent, and to show you why this Claim 1 is identical to the Claim 20 in that case. So in Claim 20 of the Myriad Patent and the AMP1 and AMP2 decisions, that claim had three parts. It was growing two host cells, one in the presence of a cancer therapeutic, and then determining the growth rates, and then comparing those growth rates. The determining and comparing steps were just abstract. There was no citation of any particular technique to make the comparison and the determination. The growing of the cells, growing of two different cells, a control and then a variable, and then comparing those two things together. Scientists have been doing that for a long, long time. Doing those three steps together with cells, that had been being done. The only difference was in this claim, what was claimed was the presence of an altered host cell that had the BRCA1 gene put into the cell. So that cell, though, exactly mimicked a naturally occurring cell. It was growing. It was meant to mimic what was happening in the human body, because in that claim you're testing a cancer therapeutic. So that cell needs to be working just like a human cell. So once the man-made cell is created, it's identical in all aspects to a human cell that has the BRCA1 gene in it. And the court in that case held just the presence of this man-made cell and the fact that these claim steps are premised on the use of that cell, conferred patent eligibility to that claim. And here in claim one, we have the same situation. If you look carefully at the claim limitations, the first limitation says that you amplify a non-coding, a genomic non-coding DNA sequence. So what I mean by genomic is that it's naturally occurring DNA. To create a amplified non-coding sequence, and the word that's used in the claim is sequence. So we've created multiple man-made copies of a sequence of DNA. And those copies are chemically different than the naturally occurring DNA. And the reason why is because there is, in naturally occurring DNA, the cytosine is methylated. So you'll see a nitrogen-hydrogen group and a methylation group and there's an oxygen group. And then this would be the center. If I charted this molecule for you, it would look kind of like this. When you amplify DNA, the same cytosine or methyl cytosine becomes cytosine and it looks like this. So this methylation atom is gone. And every nucleotide? It is lost. Any methylated cytosine, when it's amplified, looks like this. It goes from this to this. So it is, in fact, chemically different. This is a factual. That's part of the amplification step. It happens during the amplification step and the change in the chemical status is alleged in detail. So the amplification step couldn't be patentable if it were novel, the problem is it isn't. Amplification in of itself is not novel, but what our claim 1 does is it requires the practitioner to create amplified DNA, which is a man-made material that is chemically different, which we allege in our complaint is chemically different in great detail, the methylation status. And so this is something that the court has to deem as true on Rule 12b6 motion. And then, in the second step of the claim, it says you have to analyze that amplified non-coding DNA sequence, that man-made material. And it's a section of material, okay? Then from that analysis step, you have to detect the coding region of the world. So it's a whole process. It's not just like an area of somewhere. Well, I mean, what you're suggesting is that if at the second step there's something that is patentable, that that takes us out of MAYA. That's right. Well, that's a hard sell. Well, but it's not just the fact that we're amplifying a location, because once you amplify it, you actually have to do something else to it in order to detect the allele. So you're not only creating a man-made material, which this court has held, if the claim is premised on the use of a man-made material that's not naturally existing, and which claim one is, that confers patent eligibility in of itself. And the AMP decision actually says even if all the steps that you're performing on that ineligible material are routine and conventional, and as they were in the Claim 20 case. So under the AMP decisions, claim one is patent eligible. Following the Mayo Alice protocol, applying that test, we think it's also patent eligible, because firstly, we don't think it's directed to either the discovery, Dr. Simon's discovery of the linkage disequilibrium, or his observation of how one could generally use that. And there are other ways that one can use his observation using the non-coding to find the coding that are alleged in our complaint, and not contested by the other side. And then there's this inventive concept on top of that, which is that no one had ever amplified one location of DNA before, taken that, analyzed it, to find something else. We are into your rebuttal, so we'll restore three minutes.  Good morning, Your Honor, and may it please the court. In our view, Judge Dyack Ariosa does control this case. The distinctions that have been offered here are distinctions that were already dealt with and rejected in the Ariosa case, and I think I can go through those in relatively short order. Can you focus on the one that I guess I'm fastening onto, which I guess is to use the expression just given, nobody had ever amplified region A to find region B before. That's certainly not the case in Sequinam, so on the facts it would be different. Well, sure. How do, unless you tell me I've misunderstood it, and second, how do we know on this record on a motion to dismiss that that adds nothing to the scientific regularity of nature that region A and region B travel together in generations? Sure. Well, so to start with the first part of your question, in the Sequinam decision there was a discovery. It was a new discovery. No one knew about it before, the fact that there was cell-free fetal DNA floating in the mother's blood and plasma. That's the natural phenomenon. And the claim said, find it. And the claim said, this thing is here, go find it. And that's no, it's really no different than what we've got here in that respect. This does, this is different because the last words of the claim say, find A in order to find B. Right, but that find A in order to find B is the natural correlation. That is the same natural, that is the same natural phenomenon that is not eligible for with the fact that A and B are correlated. Maybe, maybe nobody would think, if I want to find B, or maybe everybody would think, if I want to find B, look for B. Why would I bother to look for A? Because somebody had an idea that says A might be easier to find. Okay, so I think what's happening here is that the, my friend on the other side has tried to divorce, rather artificially, the discovery and the observation. And what you're, what you're suggesting to me is that the observation is what... Put aside his terminology. I'm just, look, I mean, we are in, to put it mildly, uncharted and unclear territory here. And we're trying, I'm trying to figure out where this goes. At some point, as the Supreme Court recognized, every single thing in biology is about identifying what's going on in the natural world, in human bodies. At some point, there are techniques for making use of that that must be on the patentable, patent eligible side of the line. Why is, is it not on the patent eligible side of the line to say, now that I know that A and B occur together with a regularity, that if I'm interested in B, I'll think about finding A? That doesn't seem like the same thing as the fact that there is this regularity. Well, I, if it isn't the same thing, it's awfully close to the same thing. And how do you get to the same thing? You get to the same thing through the exact same routine and conventional steps that were set forth, not only in this patent specification. Once you decide that it's a good idea to look for A, to find B, it may be that the steps are routine and conventional. But so what? Why is that enough? Why is that enough? Because what you're doing, it's exactly Mayo, and it's exactly Ariosa. You are starting with a natural law, a natural phenomenon. Sequinom is written not in terms of natural laws, but natural phenomena, namely the thing itself, the self-free fetal DNA. Right. And this is, and this is no different than that. This is the thing itself. This is that there is a correlation between this non-coding region and this coding region. It seems to me we've moved from natural phenomenon to law of nature. I think the terminologies have been used interchangeably, but the phenomenon is probably a way to look, to suggest that we're talking about the observation versus the discovery of the natural law. And in that case, we have the admission of the other side that even that observation is an abstract idea. So what we've, what we've got here is, is either at the start of the claim, a natural law or natural phenomenon, followed by an abstract idea, combined with routine and conventional steps. I would actually say to you, Your Honor, that this case is even farther away from that, that mythical line of patent eligibility that Ariosa is. Ariosa, at least you had this very specific application that this is, this is going to be a great opportunity to not have to put a big needle into the fetus or into the placenta in order to get the sample to detect the, any, any abnormalities in the fetus of a pregnant woman. Here, you have just a very generic claim. It's a generic instruction to analyze some DNA in some way and using techniques which are conventional and routine and set forth as such in the patent, in the complaint, and in the prosecution history, which is part of the 12B6 record here. Now, that takes me to the other question that you've asked me, which is, why is this record appropriate for disposition on 12B6 instead of, say, summary judgment? Well, Ariosa in part can answer that because, yes, that was a summary judgment decision, but look at what was relied on, what, look what was necessary to the decision. There is only one reference to some deposition testimony in there. Everything else is claims and specification, claims and specification. And there's also one reference there to prosecution history. Your decisions from this court in ultra-mercial on remand, the 772F3rd version of it, the content extraction decision, the OIP Technologies case, and in judgment on the pleadings by SAFE versus Google, which I think there's a lot of overlap between the members of this panel, but those are all presidential decisions of this court, and they all recognize that this 101 issue is appropriate for Rule 12B6 determination. Sure, and there can't be any doubt that sometimes it's appropriate. It depends on whether the knowledge necessary to decide if anything beyond the underlying ineligible matter, whether it's abstract idea or regularity of nature, is, I guess in Mayo's language but not Alice's language, routine, conventional, and whatnot. As to this case, I guess I'm struggling to understand. It seems to me if I say everybody would know that once you notice there's a regulation, correlation between A and B, if you want to find B, look for A, I would be saying to myself, I'm just making that up. Maybe it's true, maybe it's not true. I mean, I'm not Dr. Taranto with a PhD in biology. How do I know this? Well, Judge Taranto, I think that the answer is that if there's a correlation, if when you see A, B appears, then it is, in the words of Mayo, well understood and routine and obvious to- How do I know that? I know it in Mayo because, in fact, the physical steps at issue were, in fact, undisputedly all being done. The particular drug was being given to patients and blood was being drawn to get the metabolites and the only thing that was new was, look at the number, that's all. But here we have new physical steps. When you're looking for B, look for A. I'm truly at a loss to understand how I am, without being presumptuous, to say everybody knows that that would be a really good idea. Well, I'm having a hard time, with all respect, Your Honor, and I don't want to be presumptuous as the advocate standing in front of the judges. I'm having a hard time understanding how that isn't just another way of phrasing the natural law or, putting it in my friend's terms, the abstract idea. That is the relationship between A and B, as we've been discussing it here. But suppose, for example, that the allele differences, the number of nucleotide differences between alleles was not a single one but, say, was 17,000 and the number of nucleotide differences in the associated introns was two. You probably wouldn't go look for the intron difference because they'd be a lot harder to find. Now, how do I know that it's a good idea to look for the intron difference in order to find the exon difference when you could just look for the exon difference? I think you've just assumed away the natural law that we all know doesn't count in derivation. No, the natural law that's described is that there are certain associated introns and exons. Right? That's right. Why would you look for the introns if you're ultimately interested only in finding the exons? Because now that you have the natural law in front of you, which is part of the general understanding part of what belongs to everybody, now you know that when you have A, you're going to have B. And ultimately, I want to make sure that in my time here, I am addressing not only your questions but the arguments made by my friend. Ariosa. Back to Ariosa for a second. If you look at Section 5, the beginning of Section 5 of the opinion, the part that begins for completeness. The same argument that's being made here, which is that no one was using the plasma or serum of pregnant mothers to amplify and detect paternally inherited CFF DNA, was made and rejected by the panel in that case. That's after the denial of rehearing. That's the law of the circuit. Judd Dyke's proposed approach in Ariosa, I think, also makes this case fit comfortably within the cases that are patent ineligible. This is not a narrow-in-scope application. It is a very broad-in-scope application. When you contrast that to the myriad claims that my friend brought up, I think he said Claim 20, you had a transformation into an entirely different material, which was starting at the beginning of that case. You were growing two host cells. This case, you're simply amplifying. And if there's any dispute about what amplifying means, the answer could be found in the fairly large definition sections of this patent. And it says in Column 5, Line 55, the term amplified DNA sequence refers to DNA sequences which are copies of a portion of a DNA sequence in its complementary sequence, which copies correspond in nucleotide sequence to the original DNA sequence in its complementary sequence. Under BRCA1 and the Dolly the Sheep-Roslin Institute case, copies aren't enough, in the same way that having different bonds at the end of the isolated DNA weren't enough to make the composition claims to naturally occurring DNA in the myriad case eligible for a patent, according to the Supreme Court. So with that, unless the Court has further questions for me, I'll cede the remainder of my time to Ms. Wigmore. Thank you. Good morning, and may it please the Court. I would just like to briefly address Judge Toronto's question about the Ariosa case. In fact, the claim in that case is nearly identical to the claim here in the sense that the idea was to detect DNA of fetal origin by looking at the paternal DNA in the maternal sample. So there was this natural law that those were correlated. And again, you're looking at a sample of paternal DNA in the maternal blood to detect something about the fetal. So clarify this for me, and this will confirm my comparative ignorance of the biology. Is the paternal DNA part of the fetal DNA? It is DNA of paternal origin that's found in the maternal sample. That's found in the fetal DNA. And it indicates something about the fetal. It's a part of the fetal DNA. The paternal DNA? Yes. Is it? It's referred to in the claim as... It's just various sequences. I mean, you've got the fetal DNA. Some parts of it are coming from the mother and sometimes some from the father, and you're looking for the father ones because the mother's ones are not going to distinguish between the maternal DNA and the fetal. But the paternal is, in fact, the fetal DNA. Yes. And the discovery was that if you identify that paternal DNA in the blood, that will tell you something about the fetus. So that is analogous to the claim in this case where you have a natural law that correlates the non-coding DNA with the coding DNA. And what the claim does is basically say, amplify to determine the non-coding DNA and analyze that to determine if there's a correlation. There's nothing specific in the claims about a particular application. It simply says, as in Mayo, amplify using routine and conventional steps, analyze using routine and conventional steps, and use that information as you see fit. Note, based on this natural law of the correlation. So it's simply applying a natural law using routine and conventional steps. Thank you. A couple of things I'd like to address, firstly. The claim one is not directly, simply, when you find A, you found B. If you look at the claim limitations, it requires that you create an amplified DNA sequence, and then you have to analyze that. And you may not find A, and therefore you don't find B. So you don't automatically, in this claim, as the other side suggests, is once you amplify the region of interest, you've essentially, the whole thing collapses into you found B. There's an additional step that's required, and that's the analysis step. And then when that step is performed, you detect B. Would it be fair to say that these claims cover any comparison for any purpose? They cover any, you can use the technique wherever there is, in fact, linkage disequilibrium that exists between a non-coding region and a coding region. As long as you know that that exists. Then the technique would work. Pretty broad. It's widely applicable. I wouldn't say it's broad. It's just like DNA amplification. It works on all DNA, not just one little area of DNA. It's a process that works everywhere, but where there is this linkage disequilibrium. Another point I want to highlight, there is no evidence in this case that the way that Dr. Simons applied amplification in the other parts of the claim was routine and conventional at the time that this patent was filed. The examiner's reasons for allowance, which we cite on page 5 of our opening brief, specifically said that the Mullis reference, so this is the groundbreaking patent on PCR amplification, does not teach or suggest applying this technique to the non-coding DNA. The Delayla reference, that the other side... But that all by itself can't distinguish Sequinon. Sequinon says is about the application of old techniques to a particular molecule that it had never been applied to, and the court said, nevertheless, that's ineligible under 101 because all the techniques are old. In Areosa... Including in combination. They found a new source for a material that was known. If you just take the CFDNA out of that claim, which I don't think is a proper analysis, by the way, but if you take that CFDNA out of the claim and you just say, we found a new source of biological material. At the time that that claim was filed, it was very well known to use amplification to just go get a DNA sample from a biological source, just the way that it was claimed. So they just said, go get it. Don't do anything with it. They said, go get this material, which we already know about, which we already are using, and go get it. That's it. And then some of the dependent claims said perform a test on it, which was also very well known. Test it to see if it has a particular trait. And it was just getting the material from a different source that was new, and that was the discovery. The last thing I want to talk about is just Dr. Simons. Put ourselves back in the shoes of Dr. Simons, back when he made his discovery. Everybody thinks that non-coding DNA is junk. They literally called it junk. He realizes that there is a correlation between the two that can exist. One can be in linkage disequilibrium with the other location, the coding region. And he then thinks, well, what can I do with this now that I know this? What are some of the other possible things that one might do with the fact that there is this correlation? Well, you could use B to find A is the first thing. And we're only claiming using A to find B. What else? Honestly, I don't know. I'm not a scientist like yourself. I'm not a scientist either. But at least we're only using one A to find B, not B to find A, to the extent that using B to find A might be useful. That is not precluded at all by the patent. So Dr. Simons makes his observation. This I can use A to find B. How am I going to practically implement this? What tools are available to me to do this? I've just heard about amplification. Those patents just issued in 1987. They're not even under license yet. Maybe I can use that tool as a part of my process. I don't want to cut you off, but you're extending your time. If you have one final thought, quick thought. You've exceeded your time. If you have one final quick thought. I've finished. Thank you. Thank you. We thank all parties, and the case is submitted.